UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

SUZANNE M. TUPPER,

    Plaintiff,

v.

APCO ASSOCIATES, the Plan Administrator, a foreign corporation; and UNUM LIFE INSURANCE COMPANY OF AMERICA, a foreign corporation,

    Defendants.

CASE NO. C04-2092C

ORDER

I.  INTRODUCTION

This matter has come before the Court on Defendants' motion for summary judgment (Dkt. No. 16) and Plaintiff's cross-motion for partial summary judgment (Dkt. No. 23). In addition to the substantive motions, Defendants filed a motion to strike parts of the Langer declaration (Dkt. No. 25) and Plaintiff filed a motion for review of new case authority (Dkt. No. 28). Having carefully considered the papers submitted by the parties in support of and in opposition to the motions, the Court hereby finds and rules as follows.

II. BACKGROUND

Plaintiff, a 49-year old woman, was employed by Apco Worldwide as a senior-level political and

ORDER – 1

public affairs consultant. As part of her compensation benefits package, she was allowed to participate in Apco's long-term disability ("LTD") plan, which was provided by Defendant Unum Life ("Unum"). The LTD plan provides disability benefits for disabled employees. "Disability" is defined as follows:

> You are disabled when Unum determines that:
> - You are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and
> - You have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury.

(UACL 2041.) However, employees suffering from disabilities due to mental illness or to sickness or injury primarily based on self-reported symptoms may only receive benefits for a 24-month period. (UACL 2046.) Symptoms are found to be "self-reported" within the meaning of the policy when

> the manifestations of your condition which you tell your doctor . . . are not verifiable using tests, procedures or clinical examinations standardly accepted in the practice of medicine. Examples of self-reported symptoms include, but are not limited to headaches, pain, fatigue, stiffness, soreness, ringing in the ears, dizziness, numbness and loss of energy.

(UACL 2062.)

Plaintiff, who now characterizes herself as a "severely disabled individual who suffers from Rheumatoid Arthritis, Serologically Inert Undifferentiated Connective Tissue Disorder and Fibromyalgia" (Pl.'s Resp. 1:14–16), began to experience symptoms in the fall of 2000. By February 2001, the symptoms, including fatigue, arthralgias, night sweats, anorexia, and weight loss (UACL 0020), had become such that Plaintiff was unable to continue working. Unum considered Plaintiff's last day worked to be February 28, 2001. (UACL 0017.)

Plaintiff was referred to Dr. Carl Brodie, who is certified in both internal medicine and rheumatology, in early February 2001. (UACL 0287.) Dr. Brodie recalled in an oral medical report prepared in March 2003 (UACL 0464–69) that "her family physician [had been] so alarmed at her condition [in early 2001] that he hospitalized her and aggressively evaluated her, in hospital, without any specific findings that helped him to figure out how to treat her." (UACL 0464.)

In progress notes dated February 21, 2001, Dr. Brodie noted:

ORDER – 2

> Sue continues to suffer with disabling symptoms despite extensive negative serologic and radiologic evaluation. Lack of findings by Dr. Moss and Dr. Wasserman is reassuring though obviously given the uncertainties here, we will need to keep our eyes open and watch for unexpected problems. Nonetheless, I think that we do need to move forward with some sort of treatment strategy and, given the very inflammatory character of Susan's [*sic*] symptoms, I think treating this as an autoimmune disease makes the best sense.

(UACL 0276.) Ultimately, Dr. Brodie diagnosed Plaintiff as having an undifferentiated connective tissue disease. (UACL 0464.) Dr. Brodie explained:

> Connective tissue disease, which includes lupus, which most people are familiar with, will have a variety of symptoms including most of the things that bother Sue. Joint pains, fatigue, diffuse aches and pains, cognitive impairment and some of the other things that she's had. And the disorder can have relatively subtle laboratory findings on occasion. All of which has fit the scenario for Sue. She does not fit into one of the nameable connective tissue disease syndromes like lupus and so diagnostically she is eligible for the undifferentiated syndrome because of the relatively atypical pattern of her illness.

(UACL 0465.)

On May 18, 2001, Unum sent Plaintiff a letter notifying her that her request for long-term disability benefits had been approved, but cautioned her that a final eligibility determination had not yet been made. (UACL 0028.) On October 31, 2001, Unum notified Plaintiff that the reservation of rights communicated in her May 18, 2001 letter, was being removed. (UACL 0038.) However, Unum reminded Plaintiff that disabilities primarily based upon self-reported symptoms were subject to a 24-month limitation.

One year later, Unum reminded Plaintiff of the 24-month limitation period and said that it would review Dr. Brodie's data regarding objective evidence of an inflammatory process. (UACL 0059.) On November 25, 2002, Unum confirmed that its review of Dr. Brodie's data "continue[d] to document symptoms of fatigue and pain and a lack of clinical findings" and concluded that Plaintiff's disability "continues to be based on self-reported symptomatology." (UACL 0068.)

In April 2003, Unum received notice that Plaintiff had retained an attorney to assist in her claim processing. (UACL 0093.) On May 29, 2003, Dr. Francis Bellino, a Unum consulting physician, reviewed Plaintiff's medical file as it had been provided to Unum and concluded that a physical capacity

ORDER – 3

1  evaluation performed in February 2003 by Dr. Theodore Becker provided objective data supporting
2  Plaintiff's level of impairment.  Soon thereafter, Unum notified Plaintiff that she was eligible for
3  continued benefits past the 24-month period, but that Unum would be scheduling an independent medical
4  examination ("IME").  (UACL 0087; June 6, 2003 Unum Ltr.)

5  Plaintiff underwent an IME with Dr. John Dickson, who also reviewed Plaintiff's medical file.
6  (*See* UACL 0580–96, Dickson Report.)  Among other things, Dr. Dickson's report acknowledged that
7  Plaintiff was taking Remicade, Arava, methotrexate, leucovorin, Neurontin, and Oxycontin and noted that
8  Plaintiff demonstrated some musculoskeletal tenderness, but found no actual swelling.  Dr. Dickson
9  concluded that Plaintiff had no objectively verifiable symptoms and suggested that "evidence of pain
10 magnification and symptoms disproportionate to findings suggest underlying or additional psychosocial
11 factors involved in the production and/or perpetuation and/or severity of symptomatology."  (UACL
12 0595.)  In an addendum composed after a review of additional records, Dr. Dickson stated that his
13 assessment remained unchanged, and added that "Ms. Tupper has a strong illness conviction and has
14 assumed an invalid's lifestyle, which will be difficult to reverse, given her greater than three-year history
15 of symptoms."  (UACL 0603.)

16 A few weeks after Dr. Dickson issued his report, Unum sent a letter to Plaintiff terminating her
17 benefits under the 24-month limitation.  (UACL 0091–95; Sept. 11, 2003 Unum Ltr.)

18 Plaintiff brought this lawsuit, alleging that Defendant wrongfully characterized her claim as being
19 subject to the 24-month limitation after having conducted their claim review process in an arbitrary and
20 capricious manner.  The parties have now cross-moved for summary judgment.

21 III.    ANALYSIS

22     A.    *Applicable standard*

23 "[W]hen an ERISA plan vests the plan administrator or fiduciary with discretionary authority to
24 determine benefit eligibility, the district court ordinarily reviews the decision to grant or deny benefits for
25 an abuse of discretion."  *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999) (citing

26 ORDER – 4

*Firestone Tire Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)). In such circumstances, "the usual tests of summary judgment, such as whether a genuine issue of material fact exists, do not apply." *Id.*

Plaintiff concedes that the LTD plan that is the subject of this lawsuit vests Defendant with discretionary authority to determine benefit eligibility, and therefore, generally speaking, that the abuse of discretion standard of review is appropriate. However, Plaintiff argues that because Defendant is both the plan administrator and the source of funds for the plan benefits, a conflict of interest exists such that application of a less deferential standard is required. *See, e.g.*, *id.* at 943 (explaining that the abuse of discretion standard can be heightened by the presence of a conflict of interest).

In the Ninth Circuit, "the presence of conflict does not automatically remove the deference we ordinarily accord to ERISA administrators who are authorized by the plan to interpret a plan's provisions." *Lang v. Long-Term Disability Plan of Sponsor Applied Remote Tech., Inc.*, 125 F.3d 794, 797 (9th Cir. 1997). The conflict must be "serious" in order for a court to heighten its scrutiny. *Bendixen*, 185 F.3d at 943. "In order to establish a serious conflict, the beneficiary has the burden to come forward with 'material, probative evidence, beyond the mere fact of the apparent conflict, tending to show that the fiduciary's self-interest caused a breach of the administrator's fiduciary obligations to the beneficiary.'" *Id.* (citing *Atwood v. Newmont Gold Co.*, 45 F.3d 1317, 1323 (9th Cir. 1995)). This material, probative evidence may consist of "inconsistencies in the plan administrator's reasons, insufficiency of those reasons, or procedural irregularities in the processing of the beneficiaries' claims." *Nord v. Black & Decker Disability Plan*, 356 F.3d 1008, 1010 (9th Cir. 2004), *cert. denied*, 125 S.Ct. 62 (2004). The ultimate question a court must answer is whether the administrator's denial of benefits "was born out of the apparent conflict of interest." *Id.*

Once a claimant has made the requisite initial showing of material probative evidence that the administrator's self-interest improperly influenced its decision, the burden then shifts to the administrator to show that the conflict did not affect the decision. *Bendixen*, 185 F.3d at 943.

    1.  *Material probative evidence of self-interest*

ORDER – 5

Plaintiff argues that Unum's allegedly distorted interpretation of the self-reported symptoms clause and its discounting of certain of Plaintiff's doctors' observations and records constitutes material probative evidence of an abuse of discretion caused by a conflict of interest.

### a.. Plan construction

ERISA plan administrators abuse their discretion if they construe provisions of the plan in a way that conflicts with the plain language of the plan. *Taft v. Equitable Life Assurance Soc'y*, 9 F.3d 1469, 1472 (9th Cir. 1993). The appropriate inquiry "is not into whose interpretation of the plan . . . is most persuasive, but whether the plan administrator's interpretation is unreasonable." *Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 553 (9th Cir. 1995).

In the case at bar, Plaintiff urges that Unum's insistence that Plaintiff's disability must be proved through objective clinical findings (as opposed to reports of pain not verifiable using tests, procedures or clinical examinations) is contrary to the plain language of the self-reported symptoms clause. This clause provides that a symptom is self-reported when "the manifestations of your condition which you tell your doctor are not verifiable using tests, procedures or clinical examinations." (UACL 2062.) For support, Plaintiff cites to *DiGiacomo v. Liberty Life Assurance Comp.*, 2004 U.S. Dist. LEXIS 7268 (N.D. Cal. 2004), in which a court found that an insurer's insistence on objective data ran contrary to the plain language of the plan and constituted an abuse of discretion. However, the *DiGiacomo* Court noted that "the Policy at issue does not require objective data." *Id*. at *14. The opinion in *DiGiacomo* does not allude to any language analogous to the self-reported symptoms limitation contained in the plan in the present case. For this reason, the Court finds that *DiGiacomo* is not instructive under the facts in the case at bar.

Here, it takes no great interpretive effort to construe the self-reported symptoms clause to mean that symptoms are *not* self-reported, and thus not subject to the 24-month limitations period, when the manifestations of the condition reported to a claimant's doctor are verifiable through tests, procedures and clinical examinations standardly accepted in the practice of medicine. Unum's interpretation of this

ORDER – 6

clause to require that a claimant's reported symptoms be accompanied by objective data verifying the existence of such symptoms is not contrary to the plain meaning of the plan language. Therefore, the Court finds that Unum's insistence on objective findings is not an abuse of discretion.

Unum did not insist only on objective findings, however. In its letter notifying Plaintiff that her appeal had been denied, Unum stated that "the submitted medical documentation did not provide *consistent* evidence of impairment from a physical disease or injury." (UACL 1990 (emphasis added).) Indeed, an additional review of Plaintiff's medical file conducted by Dr. Woolson W. Doane acknowledged the presence of objective findings of swelling by both Dr. Brodie and Dr. Brown. (UACL 1908, 1911.) Despite this acknowledgment, Dr. Doane expressed surprise that additional findings were not also made and focused on his negative opinion of Dr. Brodie's diagnosis.

In light of Dr. Bellino's previous conclusion that evidence of joint swelling supported Plaintiff's claimed functional impairment (UACL 0493), Dr. Doane and Unum's later-added requirement that there be more evidence is not consistent with the plain language of the plan or with Unum's own previous conclusion in June 2003. The self-reported symptoms clause does not require that there be no conflicting evidence, only that the symptoms reported find some support in the objective data. Thus, Unum's additional requirement that the evidence be *consistent* is contrary to the plain language of the plan in that it effectively imposes a new requirement for coverage. Imposing this additional requirement is an abuse of discretion. *Saffle v. Sierra Pac. Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 458 (9th Cir. 1996) (employing the principle that imposing a new requirement for coverage constitutes an abuse of discretion).

In addition, Unum's reasons for denying Plaintiff's claims changed between September 2003 and August 2004, even though no new actual and significant data was produced. When Unum denied Plaintiff's claim in September 2003, after Dr. Dickson issued his report, the denial was based on Dr. Dickson's rejection of Dr. Brodie's documentation and Dr. Becker's methodology and conclusions, in effect highlighting the importance of Dr. Brodie's findings of swelling. However, when Unum denied

ORDER – 7

Plaintiff's appeal, in August 2004, citing to the lack of *consistent* objective data, Unum changed its rationale. This change occurred even though no significant new data had been added. Instead, two more physicians had reviewed the file and added their interpretations of the records contained therein. Notably, one of the physicians expressly acknowledged the presence of objective findings of swelling, but declined to find *consistent* evidence of a functionally impairing disease. (UACL 1907.) This inconsistency in Unum's decision-making constitutes material, probative evidence of an abuse of discretion. *Nord*, 356 F.3d at 1010.

Both of these abuses of discretion are material probative evidence tending to show that Unum's self-interest caused a breach of its fiduciary duty to Plaintiff.

### b.   *Discounting of Plaintiff's doctors' reports and findings*

Plaintiff argues that even if objective findings are required by the plan language, Unum's discounting or complete disregard of her physicians' findings is an abuse of discretion constituting material, probative evidence of a conflict of interest. *Black & Decker Disability Plan v. Nord* established that a plan administrator need not give a claimant's treating physicians any special deference. 538 U.S. 822, 829 (2003). At the same time, the Supreme Court cautioned that "[p]lan administrators, of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834.

In the present case, Unum initially approved Plaintiff's claim for continuing benefits after its consulting physician, Dr. Bellino, concluded that Dr. Brodie and Dr. Becker had provided some objective data tending to support Plaintiff's "claimed functional impairment". (*See* UACL 0492–0495.) However, in the same letter notifying her of this decision, Unum also told Plaintiff that it would be scheduling an IME, with further details to follow. (UACL 0087.)

Dr. Dickson, who performed the IME, found no swelling in Plaintiff's joints, but did find

ORDER – 8

tenderness in six of the eighteen fibromyalgia tender points.[1] (UACL 0592–93.) After having examined Plaintiff and reviewed most of her medical records, Dr. Dickson concluded that his examination had revealed "no objective evidence of active inflammatory joint disease to explain her disproportionate symptomatology and disability." (UACL 0594.) Dr. Dickson added that examinations performed by Plaintiff's treating physicians which had found joint swelling and diminished joint range of motion were "not accompanied by description of severity, or comparison of active vs. passive range of motion or correlation of the two." (UACL 0594.) Thus, Dr. Dickson's report reflects that Dr. Dickson considered and rejected Dr. Brodie's documentation of swelling.

After Dr. Dickson issued his report, Dr. Bellino performed another medical file review taking into account Dr. Dickson's report. Dr. Bellino concluded

> In a prior medical review I gave credence to Dr. Brodie's findings of joint swelling. Dr. Dickson who has examined the claimant and is a like credentialed rheumatologist does not find these to be adequately described or specific enough to consider objective. I would defer to Dr. Dickson's opinion as he has examined the claimant.

(UACL 0559.)

In the course of further reviews of Plaintiff's case file, Unum consulted with two more physicians, who performed medical reviews of Plaintiff's file. The first physician, Dr. Woolson W. Doane, acknowledged that Dr. Brodie had recorded diffuse tenderness and mild swelling throughout the period from February 2001 through 2003. However, Dr. Doane questioned Plaintiff's apparent unresponsiveness to the high doses of steroids – "[f]ailure to obtain relief of pain from an inflammatory condition would be unusual with high dose steroids since it is reported that patients with undifferentiated connective tissue disease respond dramatically to appropriate immune suppression therapy/anti-inflammatory medications." (UACL 1908.) Dr. Doane added that "repeated laboratory, imaging and examinations by other physicians have not shown evidence of any organ system dysfunction or joint

---

[1] For a relatively complete discussion of fibromyalgia in the context of disability law, see *Jordan v. Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869, 872–73 (9th Cir. 2004).

ORDER – 9

deterioration as would be expected in a rampant autoimmune disease that failed to respond to maximum therapy." (UACL 1908.)  Dr. Doane also cast doubt on Dr. Becker's findings from the physical performance evaluation, remarking that the muscle spasms and decreased work performance observed by Dr. Becker could have been caused, respectively, by heightened anxiety and deconditioning. (UACL 1909–10.)  Dr. Doane concluded that Plaintiff's functional impairment was due not to physical disease or injury, but to the high doses of medications she was taking and to "chronic illness behavior". (UACL 1912–14.)

The second medical file review was conducted by Dr. Elizabeth Hendrikson, a board certified clinical neuropsychologist.  Dr. Hendrikson concluded that Plaintiff had suffered from a psychiatric condition at least since February 2, 2001, when she had been diagnosed with "probable somatization spectrum disorder" (UACL 1924) and that Plaintiff's psychiatric condition impaired her so that she could not have sustained work capacity during the reported period of disability (UACL 1925).  Dr. Hendrikson also observed that Plaintiff's use of narcotics could adversely affect her functional ability. (UACL 1925.)

Based on Dr. Doane and Dr. Hendrikson's reports, Unum denied Plaintiff's appeal.  (UACL 1982–91.)  In its letter to Plaintiff, Unum stated that "the submitted medical documentation did not provide consistent evidence of impairment from a physical disease or injury" (UACL 1990) and added that it had determined that Plaintiff's impairment was due to a psychiatric condition[2] (UACL 1991).

Having reviewed Plaintiff's medical file as it existed at the time of Unum's assessments, the Court concludes that Unum's rejection of Plaintiff's treating physicians' observations and opinions was arbitrary.  Unum had no reasoned basis to reject Dr. Brodie's documentation of swelling once Dr. Doane accepted those findings as credible even though he was fully aware of Dr. Dickson's opinion.  (UACL

---

[2]This latter determination is not impermissibly inconsistent with Unum's September 2003 decision, because the documentation supporting the September 2003 decision left open the possibility that Plaintiff's claimed functional impairments could be caused by her supposed psychiatric disorders. Dr. Bellino reasoned that no further investigation into this possible line of causation was necessary because the 24-month limitation period applied to mental illnesses. (*See*, *e.g.*, UACL 1984.)

ORDER – 10

1910, Dr. Doane discusses Dr. Dickson's findings.)  Once Dr. Doane issued his report, Unum had one doctor who rejected the documentation of swelling and one who accepted it.  The Court also notes that Dr. Dickson's own examination findings, documenting no swelling, constitute only one single data point in Plaintiff's entire medical record and thus cannot serve as a basis for a reasoned discrediting of all of the previous findings of swelling made by Dr. Brodie.  Thus, because Dr. Dickson's clinical findings cannot, on their own, impugn the reliability of Dr. Brodie's findings, and because Dr. Dickson and Dr. Doane differed on this point, Unum had no non-arbitrary basis upon which to disregard Dr. Brodie's findings of swelling in making its decision.

Accordingly, the Court finds that Unum's rejection of Dr. Brodie's findings was arbitrary and in contravention of the Supreme Court's edict in *Black & Decker*.  This arbitrary decision-making on Unum's part constitutes material probative evidence of a conflict of interest.

As the Court finds that Plaintiff has sustained her burden of demonstrating material probative evidence that Unum's self-interest improperly influenced is decision, unless Unum can show that the conflict of interest did not affect its decision, the Court "should not defer to the administrator's presumptively void decision." *Lang*, 125 F.3d at 798.

> 2.   *Plan administrator's rebuttal of presumption that tainted decision is void*

Once the burden has shifted to the plan administrator, the administrator may rebut the presumption that the tainted decision is void by showing that its decision "in fact benefitted the plan as a whole and therefore the rest of the beneficiaries under the plan." *Lang*, 125 F.3d at 798.  Here, Unum's rebuttal consists of a single sentence flatly stating that "benefits decisions are made in the interest of other plan participants and to preserve plan resources."  (Unum's Reply 10.)  Although presumably any decision to deny benefits preserves plan resources and thus necessarily benefits all the other participants in a plan (because there are more resources to draw from), merely accepting this general principle as a sufficient showing in rebuttal eviscerates the two-step conflict-of-interest analysis.  If this general principle were sufficient, no matter no blatantly tainted a denial of benefits might be, the administrator

ORDER – 11

would always be able to obtain deferential review by asserting that the denial benefitted other plan participants because of its effect in conserving plan resources. This would, in effect, short circuit the conflict analysis and render it meaningless because the appropriate standard of review would always be the abuse of discretion standard. The Court therefore concludes that an administrator rebutting a claimant's allegations of self-interest and breach of fiduciary duty must be required to do more than merely to state that the denial of benefits was in the interest of other plan participants. Indeed, *Lang* itself requires that the administrator make this showing "in fact." *Lang*, 125 F.3d at 798. Under this standard, the Court finds that Unum's single-sentence assertion does not sustain its burden of showing that its decision to deny Plaintiff's claim is not presumptively void because of the taint from its self-interest.

Accordingly, the Court subjects Unum's determination to *de novo* review.

B.      *Review of Unum's determination*

1.      *Evidence reviewable by the Court*

Plaintiff urges that the Court now consider evidence not available to Unum, including MRIs of Plaintiff taken in January and April 2005. In the Ninth Circuit, a court may, in its discretion, review evidence that was not before the plan administrator. *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan*, 46 F.3d 938, 943–44 (9th Cir. 1995). However, this discretion should only be exercised "when circumstances clearly establish that additional evidence is necessary to conduct an adequate *de novo* review of the benefit decision." *Id*. at 944. The *Mongeluzo* Court found that review of new evidence was warranted in that case because of a determination that changed the legal posture of the case. *Id*. In the present case, the additional evidence sought to be introduced falls into three categories: (1) updated information regarding Plaintiff's condition, (2) additional narrative explanations from Plaintiff's physicians, and (3) general background-type information from medical reference texts.

With respect to the first two categories of additional evidence, the Court does not find that the circumstances of this case establish that this evidence is necessary for the Court to conduct a *de novo* review of the benefit decision. The updated information regarding Plaintiff's condition includes MRIs of

ORDER – 12

some of Plaintiff's small joints and Dr. Brodie's narrative interpretation of them. Consideration of this evidence is not appropriate because this evidence was not available to Unum at the time it was making its benefits decision. Consideration of this particular evidence would result in precisely the "anomalous conclusion that a plan administrator abused its discretion by failing to consider evidence not before it." *Taft*, 9 F.3d at 1472. In addition, Plaintiff provides no support for her assertion that the MRIs should be considered now because Unum should have ordered them at the time it was assessing her claim. Indeed, Plaintiff herself states that "early in the disease, radiographic evaluations of the affected joints are usually not helpful in establishing a diagnosis." (Pl.'s Resp. 8 (citing KASPER, ET AL., 2 HARRISON'S PRINCIPLES OF INTERNAL MEDICINE 1973 (16th ed. 2005)).) Unum closed Plaintiff's claim in September 2003 and denied her appeal in August 2004. If the period prior to August 2004 was too early for Plaintiff's doctors to obtain MRIs (Pl.'s Resp. 8), Plaintiff cannot be heard to fault Unum for failing to obtain them as well. *See*, *e.g.*, *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1091 (9th Cir. 1999) (finding that the defendant insurance company's failure to obtain heart films and test data did not mean that it had not conducted a "full and fair review" under 29 U.S.C. § 1133(2)).

The Court also declines to consider the second category of "new" evidence. This new evidence actually consists of further explanations and rebuttals provided by Dr. Brodie and Dr. Goodwin, responding to some of Unum's physicians' findings. However, having reviewed both doctors' statements, the Court finds that neither statement adds anything new to the record. Dr. Goodwin's simply registers his disagreement with Dr. Hendrikson's report, and Dr. Brodie's restates many of the assertions already present in his material contained in the administrative record. Thus, the circumstances with respect to this evidence does not establish that it is necessary for an adequate *de novo* review.

The last category of evidence, excerpts from medical reference texts, *is* admissible and will be considered by the Court. As Plaintiff correctly points out, the Ninth Circuit itself relied on medical reference texts outside the record to assist it in its understanding of the medical issues involved in *Jordan v. Northrop Grumman*. 370 F.3d at 872 nn.1–9. The Court also notes that its consideration and reliance

ORDER – 13

on these texts is not for the purpose of determining whether Unum erred in not considering these texts (unlike the case with respect to Plaintiff's MRIs), but merely for providing the Court with background information presumably already known to Unum's medical consultants.

In sum, Unum's motion to strike is GRANTED in part and DENIED in part.

### 2. *Substantive review of Unum's determination*

The Court's conflict-of-interest analysis led to the conclusion that Unum's decision to deny benefits is subject to *de novo* review. In conducting *de novo* review, the Court may decide the case by summary judgment. *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 978 (9th Cir. 1999). The normal standards applicable to summary judgment motions apply.

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions, and provides in relevant part, that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). In determining whether an issue of fact exists, the court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-50 (1986); *Bagdadi v. Nazar*, 84 F.3d 1194, 1197 (9th Cir. 1996). A genuine issue of material fact exists where there is sufficient evidence for a reasonable fact-finder to find for the non-moving party. *Anderson*, 477 U.S. at 248. The moving party bears the burden of showing that there is no evidence which supports an element essential to the non-movant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In order to defeat a motion for summary judgment, the non-moving party must make more than conclusory allegations, speculations or argumentative assertions that material facts are in dispute. *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 890 (9th Cir. 1994).

Unum ultimately denied Plaintiff's claim on two grounds: (1) that her medical records contained no consistent evidence of a functionally impairing disease, and (2) that her disability was caused by a

ORDER – 14

mental illness and thus also subject to a 24-month limitation. (UACL 1990–91.) The Court has already discussed many of the salient points of the first part of Unum's decision and the apparent basis for that decision in the context of the conflict of interest analysis above. In that analysis, the Court found that the record before Unum's administrator did not support Unum's rejection of the objective data supplied by Dr. Brodie, *e.g.*, that although a plan administrator may have discretion to choose between multiple sets of reliable data, it may not, as Unum did, arbitrarily determine that a particular set of data is unreliable. However, the Court has not yet addressed Unum's determination that Plaintiff's disability was caused by her alleged mental illness, thus subjecting it to the 24-month limitation.

In its letter denying Plaintiff's appeal, Unum stated "[i]t was determined that the submitted medical documentation supported that your client been impaired from sustained work capacity by a psychiatric condition since the time of her inpatient diagnostic work-up in February 2001." (UACL 1991.) Thus, Unum's letter concluded that Plaintiff's disability was solely caused by a psychiatric condition. Unum appears to have since backed off of this absolute position somewhat, for example noting that Plaintiff has a "psychological component to her claim." (Unum's Reply 8.)

As a preliminary matter, to the extent that Unum's letter constitutes a finding of fact that Plaintiff's disability is *solely* caused by her alleged mental illness, this finding is clearly erroneous in light of the administrative record. Much of the language in Unum's August 2004 letter is taken verbatim from its consulting physicians' reports, including the portion discussing its findings as to her mental illness. However, the letter's final step of fully attributing Plaintiff's disability to her alleged mental illness finds no support in Dr. Hendrikson's report or elsewhere in the record. Dr. Hendrikson's report concludes, in relevant part:

> My responses to the specific referral questions[3] posed by the Appeals Specialist, Holly Skillin-Dearborn, follow: Based on a reasonable degree of neuropsychological certainty, in consideration of the available information, it is my opinion that the available medical information supports the presence of a psychiatric condition, probably present since at

---

[3]Unfortunately, the text of the questions posed are not in the record now before the Court.

ORDER – 15

> least 2/2/01 . . . . I think it is reasonable to conclude that the insured has been impaired at least since 3/1/01 due to mild to moderate symptoms of depression . . ., her perceptions of pain and fatigue, and her preoccupation with numerous somatic symptoms.

(UACL 1924–25.) In light of the objective data elsewhere present in the record, including Dr. Brodie's data, Dr. Hendrikson's conclusions support only a partial attribution of Plaintiff's disability to her alleged mental illness.

The obvious question that follows this finding is how the 24-month limitation applies when the disability may only be partially attributed to a mental disorder. Unum's plan is silent on this issue, stating only that "disabilities due to mental illness have a limited pay period up to 24 months". (UACL 1983.) In *Mongeluzo*, the Ninth Circuit found that a functionally identical provision was ambiguous. 46 F.3d at 943. The *Mongeluzo* plan provided that "[p]ayment will not be made under this plan for any disability . . . for more than 24 months . . . if the disability is caused by mental illness." *Id.* at 941. The court found that this language "does not make clear whether a disability qualified as a 'mental disorder' when it results from a combination of physical and mental factors." *Id.* at 943. As a result of this ambiguity, the *Mongeluzo* Court applied the "rule that ambiguities are to be resolved in favor of the insured" and held that if there was any physical component to the disease and if that component had caused the disability in whole or in part, benefits would be payable. *Id.*

The same rule must apply here. Since the plan in the case at bar does not specify what is to happen if a disorder is only partially attributable to mental illness, under the Ninth Circuit's ruling in *Mongeluzo*, the plan must be construed to mean that if there is any verifiable physical component of disease, the 24-month limitation does not apply and benefits are payable.

Thus, the critical question remaining for the Court is whether Plaintiff's medical records contained any verifiable physical component of the disease that caused Plaintiff's disability. The medical records, including records from Plaintiff's physicians and the reports composed by Unum's consulting physicians, contain data reflecting that (1) Plaintiff suffered recurring waxing and waning swelling; (2) relatively early on, Plaintiff was put on an aggressive regimen of anti-inflammatories; (3) on one occasion, when Plaintiff

ORDER – 16

was examined by Dr. Dickson, he was unable to find any actual swelling; (4) Dr. Dickson found six out of eighteen fibromyalgia tender points; and (5) Dr. Brown found a swollen knee (UACL 1356). Plaintiff's treating rheumatologist, Dr. Brodie, diagnosed Plaintiff with a connective tissue disorder, but found her symptoms not to be typical of a specific disorder (*i.e.*, lupus or rheumatoid arthritis) and thus diagnosed her with an undifferentiated connective tissue disorder. Dr. Brown, a rheumatologist who performed an examination of Plaintiff in late 2003, agreed with Dr. Brodie's diagnosis.

In contrast, Unum's physicians disagreed with Plaintiff's doctors' diagnoses. Dr. Dickson, in particular, and also a rheumatologist, questioned Dr. Brodie's decision to continue Plaintiff on an aggressive regimen of anti-inflammatories without evidence that the medications were having a positive effect. (UACL 0594.) Dr. Dickson was also puzzled by Plaintiff's "dramatic joint tenderness" in the absence of inflammation. (UACL 0594.) However, Dr. Dickson conceded that "[t]here are no published generally agreed upon diagnostic criteria" for undifferentiated connective tissue disease. (UACL 0593.) Dr. Doane agreed with Dr. Dickson that Plaintiff's apparent failure to respond to her medications "raises the question whether her symptoms were a result of a autoimmune inflammatory condition." (UACL 1908.) Dr. Doane also noted that if Plaintiff's disease were a "rampant autoimmune disease that failed to respond to maximum therapy," he would expect to see organ system dysfunction or joint deterioration. (UACL 1908.)

The Court having reviewed the entirety of Plaintiff's medical records, the difficulty of the question that confronted Unum is clear. Even *assuming* that Plaintiffs' physicians made the correct diagnosis, the nature of Plaintiff's disease makes it difficult to verify — the waxing and waning of symptoms, the failure of systemic joint deterioration to show up in imaging films until later in the disease, the temporary relief from swelling obtained from powerful anti-inflammatory agents — all of these factors, and others, could have come together in such a fashion causing Dr. Dickson to find absolutely nothing at all in his medical examination. However, the Court is troubled by Dr. Dickson's readiness to criticize Dr. Brodie's choice of drug regimen on the basis of what Dr. Dickson perceived to be a lack of response from Plaintiff,

ORDER – 17

without recognizing that the very same treatment he criticized *could* be having its intended effect — namely in temporarily suppressing Plaintiff's swelling. The Court is also troubled by a similar attitude in Dr. Doane's report.

In light of the Court's findings above that Unum impermissibly allowed its self-interest to affect its decision-making, and in light of Dr. Dickson's and Dr. Doane's inexplicable disregard of the potential effect of the anti-inflammatory medications on Plaintiff's swelling, the Court has determined that neither Dr. Dickson's nor Dr. Doane's reports are entirely credible. Conversely, Plaintiff's file contains data that tends to support Dr. Brodie's diagnosis of an undifferentiated connective tissue disorder. Even though this data may not lend itself to a carved-in-stone, one-hundred-percent certainty diagnosis, the disease itself evades the development of consistent diagnostic and prognostic criteria. (*See* Langer Decl. Ex. 6 (KASPER, ET AL., 2 HARRISON'S PRINCIPLES OF INTERNAL MEDICINE 1972–73 (stating "[n]o tests are specific for diagnosing [rheumatoid arthritis . . . . [t]he course of RA is quite variable and difficult to predict in an individual patient. Most patients experience persistent but fluctuating disease activity, accompanied by a variable degree of joint abnormalities and functional impairment")); Ex. 7 (Daniel F. Battafarano, *Undifferentiated Connective-Tissue Disease*, EMEDICINE, Nov. 24, 2003, http://www.emedicine.com/med/topic2937.htm (stating "[s]creening serology findings . . . may be positive or negative")).) Given that Dr. Hendrikson's report did not conclude that Plaintiff's disability is solely the result of a mental disorder, and given that the record contains data supporting Dr. Brodie's diagnosis, the Court concludes that there is no genuine issue of material fact that Plaintiff's disability is caused by some sort of undifferentiated connective tissue disease.

As Unum did not contest that Plaintiff would be entitled to benefits if her disability resulted from an undifferentiated connective tissue disease, the Court finds that there remains no genuine issue of material fact regarding Plaintiff's entitlement to reinstatement of her benefits (*i.e.*, that the 24-month limitation does not apply). Therefore, Plaintiff's motion for summary judgment is GRANTED. Defendant's motion is DENIED.

ORDER – 18

Plaintiff's motion requesting that the Court review new case authority is hereby STRICKEN as MOOT.

The parties are directed to prepare a proposed form of judgment consistent with the foregoing.

SO ORDERED this 5th day of January, 2006.

_____
UNITED STATES DISTRICT JUDGE

ORDER – 19